MAINE SUPREME JUDICIAL COURT                     Reporter of Decisions
Decision:     2026 ME 76
Docket:       And-25-351
Argued:       February 5, 2026
Decided:      July 30, 2026

Panel:        MEAD, CONNORS, LAWRENCE, DOUGLAS, and LIPEZ, JJ., and HJELM, A.R.J.

ZACHARY WILSON

v.

ELIZABETH GURNEY et al.

HJELM, A.R.J.

[¶1]   On the evening of January 1, 2023, eighteen-year-old Elizabeth Gurney hosted a house party that grew large and chaotic.  When Zachary Wilson, a party guest, attempted to remove an intruder from the premises, the intruder shot and injured Wilson with a firearm.  Wilson brought a personal injury claim in the Superior Court (Androscoggin County) against Elizabeth[1] and Elizabeth's mother, Holly Gurney, asserting claims of premises liability and negligent entrustment.  The Gurneys filed a motion for summary judgment, which the court (*Archer, J.*) granted based on its determinations that the Gurneys did not have a duty to protect Wilson from the criminal act of a third

---

[1]  Because Elizabeth Gurney and Holly Gurney have the same surname, we refer to them by their given names.

party and that the theory of negligent entrustment does not apply to the use of real property.  On this appeal by Wilson, we affirm the judgment.

## I.  BACKGROUND

### A.     Factual Background

[¶2]   The following facts are undisputed for purposes of summary judgment, and we view them in the light most favorable to Wilson as the nonprevailing party.  *Grant v. Foster Wheeler, LLC*, 2016 ME 85, ¶ 2, 140 A.3d 1242.

[¶3]  Holly owns a house in Lewiston, where she and Elizabeth lived.  On the night of January 1, 2023, Holly was out of town providing care to a family member, and Elizabeth stayed at the house.  Holly had told Elizabeth that while she was away, Elizabeth could have friends at the house but not more than ten to fifteen people, no one was to drink alcohol, and all visitors needed to leave by midnight or shortly after.

[¶4] On the evening of January 1 and into the early morning of January 2, Elizabeth held a party at the house.  She had expected thirty-five to forty people to attend.  Wilson was invited to the party not by Elizabeth but by one of her friends.  The party started with a small group, but by around 11:00 p.m., two hours after the party had started, as many as one hundred people were present.

Many of the attendees had not been invited, and Elizabeth learned that someone at the party had given her address to others. Elizabeth saw that the party had grown chaotic; some attendees were intoxicated and vomiting, and some were yelling and running around in the street and in a neighbor's yard.

[¶5] At some point, four or five uninvited people wearing ski masks arrived and began selling or using cocaine in Elizabeth's bedroom. Elizabeth did not know who these people were. She was frightened by the situation but did not want to call the police because she did not want to get into trouble. At Elizabeth's request, these uninvited attendees left the premises, but she saw later that they had "snuck back" into the house, wearing different clothes. Elizabeth stood on a chair and yelled at the intruders to leave, and this time they refused.

[¶6] Elizabeth told Wilson that she had previously removed the intruders because they were using drugs but that they had returned. Elizabeth and three other people, including Wilson, who had told Elizabeth that he would help, were involved in escorting or physically removing the intruders from the house. Wilson grabbed one of the intruders by his shirt, dragged him to the door, and walked him outside. Once outside, that intruder drew a handgun and shot Wilson several times, severely injuring him.

4

## B.     Procedural History

[¶7]  Just over a year later, in February 2023, Wilson filed a multi-count complaint, later amended, against the alleged assailant, a number of people who either attended the party or allegedly had some connection to it, and an establishment that sold alcoholic beverages.  Among the named defendants were the Gurneys, against whom Wilson asserted claims of premises liability and, as to Holly, negligent entrustment of the premises.[2]  On his claim against the Gurneys for premises liability, Wilson alleged that, because he had been on the premises lawfully, they owed him a duty to provide reasonably safe premises and to protect him from reasonably foreseeable harm occurring there, and that they committed a breach of that duty, resulting in injury to him. On the claim of negligent entrustment, Wilson alleged that Holly was negligent by entrusting the premises to Elizabeth to host a house party, which created a foreseeable risk of harm to those in attendance, and that Holly's negligence proximately caused Wilson's injuries.

[¶8]  The Gurneys jointly moved for summary judgment, contending that they did not have a duty to protect Wilson from the criminal act of a third-party

---

[2]  Wilson's complaint additionally included a count against the Gurneys for negligent or reckless service of liquor.  The court entered summary judgment in favor of the Gurneys on this count, and Wilson does not challenge that part of the judgment here.  The claims against all other defendants were dismissed voluntarily or by stipulation, leaving only the two claims addressed on this appeal.

trespasser and that negligent entrustment applies only to chattels, not real property. The court agreed and granted summary judgment for the Gurneys on all counts of the complaint against them. Wilson timely appealed from the judgment. *See* M.R. App. P. 2B(c)(1).

## II. DISCUSSION

[¶9] "We review the grant of a motion for summary judgment de novo, and consider both the evidence and any reasonable inferences that the evidence produces in the light most favorable to the party against whom the summary judgment has been granted in order to determine if there is a genuine issue of material fact." *Grant v. Foster Wheeler, LLC*, 2016 ME 85, ¶ 12, 140 A.3d 1242 (quotation marks omitted). "Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gniadek v. Camp Sunshine at Sebago Lake, Inc.*, 2011 ME 11, ¶ 15, 11 A.3d 308.

[¶10] On appeal, Wilson presses two of the claims he presented below. He first contends that the Gurneys had a duty to protect him from the criminal act of a third-party trespasser either because the Gurneys were in a special relationship with Wilson or because they created an unreasonably dangerous condition that caused his injury. Then, as to his claim of negligent entrustment,

6

Wilson asks us to extend the cause of action to encompass the use of real property. We address each of these arguments in turn.

**A.    Duty to take reasonable steps to protect against the criminal conduct of a trespasser**

[¶11]  To survive a defendant's motion for summary judgment on a premises liability claim, a plaintiff "must establish a prima facie case for each of the four elements of negligence: duty, breach, causation, and damages." *Davis v. R C & Sons Paving, Inc.*, 2011 ME 88, ¶ 10, 26 A.3d 787 (quotation marks omitted).  Whether a duty exists, and the scope of such duty, are questions of law that we determine de novo. *Gniadek*, 2011 ME 11, ¶ 17, 11 A.3d 308; *Fortin v. Roman Cath. Bishop of Portland*, 2005 ME 57, ¶ 35, 871 A.2d 1208.

[¶12]  Foundational to the area of tort law at issue here is the principle that "there is no general obligation to protect others from the actions of third parties, even where one knows the third party is or could be dangerous." *Brown v. Delta Tau Delta*, 2015 ME 75, ¶ 10, 118 A.3d 789 (quotation marks omitted); *DeCambra v. Carson*, 2008 ME 127, ¶ 11, 953 A.2d 1163; *see Bryan R. v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 1999 ME 144, ¶ 12, 738 A.2d 839; Restatement (Second) of Torts § 314 (1965).  We have, however, recognized several exceptions to this principle that are germane here.  First, an actor does have a duty to protect another from a third party's criminal conduct when the

actor stands in a "special relationship" with the other person or the third party. *See Gniadek*, 2011 ME 11, ¶ 17, 11 A.3d 308; *Fortin*, 2005 ME 57, ¶ 25, 871 A.2d 1208. This means that, to be liable for a third party's conduct, the actor must have a duty either to protect the injured person or to control the third party's conduct. *See* Restatement (Second) of Torts § 315 (1965). As another relevant exception, an actor may be found liable for negligence if the actor created the dangerous situation that resulted in the harm inflicted by the third party. *See Gniadek*, 2011 ME 11, ¶ 17, 11 A.3d 308; *Est. of Cilley v. Lane*, 2009 ME 133, ¶ 21, 985 A.2d 481; *Bryan R.*, 1999 ME 144, ¶ 14, 738 A.2d 839. Wilson contends that each of these exceptions applies here. We disagree and address them seriatim.

### 1.    Special relationship

[¶13]  In a claim for premises liability, there is a "distinction between the general duty to provide reasonably safe premises, owed to all persons lawfully on the land" and "the *heightened* duty[,] . . . based on a special relationship, to proactively prevent" reasonably foreseeable criminal conduct committed by a third party.[3]  *Belyea v. Shiretown Motor Inn, LP*, 2010 ME 75, ¶ 11, 2 A.3d 276.

---

[3] Wilson's claim against the Gurneys is not based on the inherent condition of the Gurney property and residence, which would implicate a conventional duty of care to provide reasonably safe premises. Rather, Wilson alleges that the Gurneys had a duty to protect him from danger posed by a third party who was also present on the premises. Consequently, the claim at issue here generates the question of whether the Gurneys had a "heightened duty" to protect him, beyond any duty associated with the condition of the premises. *See generally Belyea v. Shiretown Motor Inn, LP*, 2010 ME 75, ¶ 12, 2 A.3d 276.

We have recognized only certain relationships as special: those in a limited class of fiduciary relationships; those in a custodial relationship, where the subordinate person does not have the benefit of "normal opportunities for protection"; common carriers and their passengers; innkeepers and their guests; and possessors of land who hold it open to the public and members of the public who are invitees. *Dragomir v. Spring Harbor Hosp.*, 2009 ME 51, ¶ 18, 970 A.2d 310; Restatement (Second) of Torts § 314A (1965); *see Fortin*, 2005 ME 57, ¶ 38, 871 A.2d 1208. Only the first of these listed relationships—a subcategory of fiduciary relationships—need be addressed here.

[¶14] In *Dragomir*, we clarified that not every fiduciary relationship qualifies as a special relationship. 2009 ME 51, ¶ 19, 970 A.2d 310. Rather, the latter is a subset of the former. A fiduciary relationship arises only where the parties are in disparate positions and it is reasonable for the subordinate party to place trust and confidence in the superior party. *Bryan R.*, 1999 ME 144, ¶ 20, 739 A.2d 839.[4] As we explained in *Dragomir*, special relationships comprise only those fiduciary relationships where there is *also* "a great disparity of

---

[4] Our discussion in *Bryan R.* can be seen to suggest that a great disparity of position and influence between the parties must exist for the relationship to be a fiduciary one. 1999 ME 144, ¶ 19, 738 A.2d 839. Elsewhere in that opinion, however, we also defined a fiduciary relationship without this element. *See id.* ¶ 20. Our opinion in *Dragomir* resolves any ambiguity on this point by clarifying that the great-disparity element serves to differentiate a fiduciary from a special relationship, 2009 ME 51, ¶ 19, 970 A.2d 310, which means that that element is not a necessary condition to a bare fiduciary relationship.

position and influence between the parties." 2009 ME 51, ¶ 19, 970 A.2d 310 (quotation marks omitted). We observed that the question of whether this limited type of fiduciary relationship exists is usually determined on a case-by-case basis but also includes those relationships where "there is always certain to be a great disparity of position and influence." *Id.*; *see Bryan R.*, 1999 ME 144, ¶ 20, 738 A.2d 839. We have specifically noted that a special relationship does not arise merely because of a friendship between the people in the relationship. *Bryan R.*, 1999 ME 144, ¶ 20, 738 A.2d 839.

[¶15] Our decision in *Fortin* provides a salient example. There, we concluded that a special relationship existed between a diocese and a teenager who was a parochial student and altar boy. *Fortin*, 2005 ME 57, ¶ 38, 871 A.2d 1208. We explained that the diocese owed a fiduciary duty to Fortin to protect him from sexual abuse by a priest because the diocese knew that the priest posed a substantial risk of harm to children; that Fortin was "subject to the supervision, control, and authority of the [d]iocese on a daily basis"; and that the relationship between Fortin and the diocese was marked by a great disparity of position and influence. *Id.* ¶ 34.

[¶16] Here, unlike in *Fortin* and similar cases, the summary judgment record does not contain evidence that either of the Gurneys was in a position

superior to Wilson, that Wilson placed his trust and confidence in Elizabeth or Holly, or that either of them swayed Wilson because of some great disparity of position or influence. Indeed, Wilson had never met Holly and thus had no relationship with her at all, and he had never met Elizabeth before arriving at her party. Instead, Wilson's relationship with Elizabeth was merely that of a party guest, who was invited not even by Elizabeth, but by a third party—so, at most, a friendship, which is insufficient as a matter of law to be seen as a special relationship. *See Bryan R.*, 1999 ME 144, ¶ 20, 738 A.2d 839. It is therefore undisputed, as a matter of law, that no special relationship existed between Wilson and either of the Gurneys.[5]

[¶17] As an alternative approach to the limited list of relevant relationships set out in our case law, Wilson suggests that as a matter of public policy we should create a new category of special relationships, namely, a social host and guest, and impose on the former a heightened duty of care to protect against dangers posed by a third person. Wilson views this as an analogue to currently recognized special relationships such as that of an innkeeper and

---

[5] Wilson additionally contends that he had a special relationship with Elizabeth because she had opened the premises to the public by allowing dozens of strangers to attend her party. *See Dragomir*, 2009 ME 51, ¶ 18, 970 A.2d 51 (listing "possessors of land and members of the public who are their invitees" as one form of a special relationship). Wilson does not meaningfully develop this argument on appeal, however, so it is waived. *See Mehlhorn v. Derby*, 2006 ME 110, ¶ 11, 905 A.2d 290.

guest. Under Wilson's approach, a social host would be subject to a duty to take reasonable steps to prevent foreseeable harm inflicted by third parties, just as an innkeeper owes such a duty to a guest.

[¶18] We have explained the analysis germane to whether to create a legal duty:

> In the decision of whether or not there is a duty, many factors interplay: the hand of history, our ideals of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall. In the end the court will decide whether there is a duty on the basis of the mores of the community always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind.

*Cameron v. Pepin*, 610 A.2d 279, 282 (Me. 1992) (quotation marks omitted); *see Est. of Cilley*, 2009 ME 133, ¶ 18, 985 A.2d 481.

[¶19] Creating a special relationship between party hosts and guests would significantly expand liability for all possessors of land in Maine; it would change or otherwise influence social customs across the State; and it would come up against reliance interests of those who own, occupy, and insure property. Given these factors and the long-standing and settled state of the law regarding the limited scope of the duty to protect others from the acts of third parties, we decline to adopt the remarkable expansion of legal responsibility

that Wilson advocates to include a relationship between social host and social guest.[6]

## 2. Creation of the danger

[¶20]  Separate from the situation where the parties stand in one of the enumerated special relationships discussed above, an actor also may be "required to guard against the intentional misconduct of others where the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct" and the harm is reasonably foreseeable.  *Gniadek*, 2011 ME 11, ¶ 29, 11 A.3d 308 (quotation marks omitted).  In determining whether such a duty exists in this kind of situation, we evaluate "whether the category of negligent conduct at issue is

---

[6] We have previously declined to impose liability in other categories of relationships, including a passenger on a trip and the trip organizer, *Davis v. Dionne*, 2011 ME 90, ¶ 14, 26 A.3d 801; a bar patron and the bar owner, *Belyea*, 2010 ME 75, ¶¶ 12-13, 2 A.3d 276; and two permitted residents of the same home, *DeCambra*, 2008 ME 127, ¶ 13, 953 A.2d 1163.  Whether an expansion of the duty may be justified in different circumstances than those presented here and in our earlier case law is a matter we cannot and therefore do not address here.  *See, e.g., Doe v. Walker*, 193 F.3d 42, 44-45 (1st Cir. 1999) (suggesting that, in some circumstances, a party host may have a duty to protect a party guest from sexual assault by a third party).  Beyond that, in view of the reach of a change in the law and the effect it would have on diverse and conflicting interests, the issue that Wilson raises affecting standards of behavior in the circumstances at bar is a matter of broad public policy and therefore is best suited to legislative consideration.  *See State v. Idris*, 2025 ME 17, ¶ 13 n.6, 331 A.3d 419; *State v. Asaad*, 2020 ME 11, ¶ 16, 224 A.3d 596.

Separately, we note that, in a claim predicated on a fiduciary or special relationship, the factual basis for that characterization must be pleaded with specificity.  *Bryan R.*, 1999 ME 144, ¶¶ 17, 21, 738 A.2d 839; *see Ramsey v. Baxter Title Co.*, 2012 ME 113, ¶ 6, 54 A.3d 710 (addressing requirements to sufficiently plead a claim based on a fiduciary relationship).  Wilson's complaint does not allege at all the existence of a special relationship and therefore does not properly invoke the theory.  We choose to bypass that deficiency, however, and instead address the merits of the claim.

sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party." *Cameron*, 610 A.2d at 282 (quotation marks omitted).

[¶21] The circumstances where liability may be imposed under this approach are highly circumscribed. In *Gniadek*, following the lead of the Restatement (Second) of Torts, we looked to the factors that must be considered when determining if someone may be liable based on misconduct that led to a third party's intentional injury-causing conduct. 2011 ME 11, ¶ 29, 11 A.3d 308. Those factors create a high bar. Just as the kinds of relationships that can support a duty to protect are narrowly drawn, the circumstances where liability may be imposed when the actor has a hand in creating a danger posed by a third person are narrow. Thus, as we discussed in *Gniadek*, for the actor to be liable for acts of a third person, the actor must have facilitated contact or some association between the injured person and the third-party perpetrator, and the actor must have had actual or constructive knowledge that the third-party perpetrator was "peculiarly likely to commit intentional misconduct, under circumstances which afford[ed] a peculiar opportunity or temptation for such misconduct." *Id.* (quotation marks omitted); *see*

14

Restatement (Second) of Torts § 302B cmt. e(D) (1965). In assessing whether

the actor meets that level of fault, the court is to consider

> the known character, past conduct, and tendencies of the person
> whose intentional conduct causes the harm, the temptation or
> opportunity which the situation may afford him for such
> misconduct, the gravity of the harm which may result, and the
> possibility that some other person will assume the responsibility
> for preventing the conduct or the harm, together with the burden
> of the precautions which the actor would be required to take.

*Gniadek*, 2011 ME 11, ¶ 29, 11 A.3d 308 (quotation marks omitted).

[¶22] The issue in *Gniadek* was whether a summer camp had a duty to

protect a former camper from a sexual assault committed by a former camp

counselor, when the assault occurred more than two months after the victim

had attended camp and after the camp had compiled and distributed contact

lists to allow campers and counselors to remain in contact during the

off-season. *Id.* ¶¶ 2-10, 28. We concluded that the camp did not have such a

duty because the camp counselor's tendencies and past conduct known to the

camp did not amount to a foreseeably high risk that he would sexually assault

a child, and the camp's distribution of a contact list "did not create a peculiar

opportunity for misconduct." *Id.* ¶ 31 (quotation marks omitted).

[¶23] Here, the record on summary judgment contains no evidence that

Elizabeth foresaw or should have foreseen that the intruder would resort to

violence, such as by shooting Wilson, in response to being removed from her party. Elizabeth did not know the intruder, and there is no evidence that she had previously observed him act violently or knew he had a firearm. Moreover, Elizabeth did not create a peculiar opportunity for the third party to shoot Wilson; Elizabeth had already excluded the intruder, and when he returned to the party as a trespasser, he brought a gun and discharged it after Wilson led him outside. Consequently, the undisputed facts of this case establish as a matter of law that Elizabeth did not engage in affirmative conduct, carried out with the requisite mental state, that created the danger resulting in Wilson's injury or that exposed Wilson to a "recognizable high degree of risk of harm." *See id.* ¶ 29 (quotation marks omitted). Therefore, Elizabeth did not owe Wilson a duty to protect him from the intentional acts of a third party. Further, there is no factual basis whatsoever to support a claim that Holly is liable under this branch of his theory of premises liability.

## B.    Negligent entrustment

[¶24] Wilson's claim for negligent entrustment is directed against Holly, whom he alleges negligently entrusted the house to Elizabeth, resulting in the party during which he was injured by the armed trespasser. In entering summary judgment against Wilson on this claim, the court's analysis was

straightforward, concluding that the claim failed as a matter of law because the cause of action for negligent entrustment can be predicated only on an entrustment of chattels, not real property. As authority, the court focused on section 390 of the Restatement (Second) of Torts (1965), which states, "One who supplies directly or through a third person *a chattel* for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them." Restatement (Second) of Torts § 390 (1965) (emphasis added).

[¶25] To date, Maine's case law has applied or otherwise discussed the doctrine of negligent entrustment only in cases involving chattels, and most of those cases involve the alleged entrustment of vehicles. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Koshy*, 2010 ME 44, ¶¶ 27-28, 995 A.2d 651 (vehicle); *Reid v. Town of Mount Vernon*, 2007 ME 125, ¶¶ 32-33, 932 A.2d 539 (dumpsters at a transfer station); *Feeney v. Hanover Ins. Co.*, 1998 ME 124, ¶ 13 n.10, 711 A.2d 1296 (vehicle); *Pelletier v. Mellon Bank, N.A.*, 485 A.2d 1002, 1004 n.5 (Me. 1985) (vehicle); *Am. Universal Ins. Co. v. Cummings*, 475 A.2d 1136, 1137

(Me. 1984) (vehicle); *Sweet v. Austin*, 158 Me. 90, 179 A.2d 302 (1962) (vehicle). As does section 390 of the Restatement, secondary authorities more explicitly frame negligent entrustment as a claim limited to chattels. *See Negligent Entrustment*, Black's Law Dictionary (12th ed. 2024) ("The act of leaving *a dangerous article (such as a gun or car)* with a person who the lender knows, or should know, is likely to use it in an unreasonably risky manner." (emphasis added)); Barry A. Lindahl, Modern Tort Law: Liability and Litigation § 32:1 (2d ed. 2026) ("Liability for negligent entrustment is based upon entrusting *a dangerous instrumentality* to another whom the entruster knows, or should know, is likely to use it in a manner involving an unreasonable risk of harm to others." (emphasis added) (footnote omitted)).

[¶26]  Here, Wilson does not challenge the way the court articulated the cause of action set out in section 390 of the Restatement, and he does not question the court's invocation of that provision or contend that some other legal principle applies here.[7]  Rather, he argues that we should expand the scope of the cause of action to encompass the entrustment of real property.

[¶27]  In considering Wilson's argument that we should create a new duty, we again look to the factors we have already noted, namely, "the hand of

---

[7]  For that reason, we confine our analysis to the principle of law set out in section 390 of the Restatement.

history, our ideals of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall." *Cameron*, 610 A.2d at 282 (quotation marks omitted).

[¶28]   Wilson's argument for substantially expanding the claim of negligent entrustment is not supported by apposite and persuasive legal authority.  Beyond that, as with his contention that we should enlarge the reach of a premises-liability claim for injuries caused by a third-party trespasser, a broadening of a claim for negligent entrustment would have profound implications for the way people use their property and interact with others, and it would have a material effect on relevant reliance interests.  More particular to this case, Holly's decision to entrust the house to her daughter, accompanied by the imposition of reasonable and appropriate restrictions, was substantially divorced from Wilson's injury, which resulted from the criminal act of a trespasser who had already been directly excluded from the premises.  When these considerations are applied to the analytical factors we note above, we are not persuaded to create a novel entrustment-related duty that, in the circumstances of this case, would allocate the loss to Holly.  We thus decline to treat this case as a vehicle that might expand the reach of negligent entrustment actions to include real property.

### III. CONCLUSION

[¶29]  The record on summary judgment does not generate a prima facie case that either of the Gurneys had a duty to protect Wilson from the criminal conduct of a third party.  Further, Wilson's claim of negligent entrustment fails as a matter of law because it is predicated entirely on Elizabeth's use of Holly's real property, which is not encompassed by that cause of action.  Accordingly, we conclude that the court correctly granted summary judgment in favor of the Gurneys.

The entry is:

Judgment affirmed.

---

Carly R. Cosgrove, Esq., and Sheldon J. Tepler, Esq. (orally), Hardy, Wolf & Downing, P.A., Lewiston, for appellant Zachary Wilson

Thomas S. Marjerison, Esq. (orally), Norman, Hanson & DeTroy, LLC, Portland, for appellees Elizabeth Gurney and Holly Gurney

Androscoggin County Superior Court docket number CV-2023-26
FOR CLERK REFERENCE ONLY